RAFFOLD PROCESS CORPORATION v. CASTANEA PAPER CO.*

No. 6222.

Circuit Court of Appeals, Third Circuit.

March 17, 1938.

Rehearing Denied July 22, 1938.

Brown, Critchlow & Flick, of Pittsburgh, Pa. (Thomas G. Haight, of Jersey City, N. J., Harrison F. Lyman, of Boston, Mass., and Edgar H. Kent, of Newtonville, Mass., of counsel), for appellant.

Smith, Buchanan, Scott & Gordon, of Pittsburgh, Pa. (William H. Davis and Louis Burgess, both of New York City, of counsel), for appellee.

Before THOMPSON and BIGGS, Circuit Judges, and DICKINSON, District Judge.

BIGGS, Circuit Judge.

In this case certain specified claims of four patents are at issue. The District Court held these claims invalid and failed to hold them infringed. All four patents relate to the manufacture of paper.

Briefly, the appellant contends as follows: That Harold R. Rafton, its assignor, invented processes or methods whereby (1) a carbonate filler can be used in the commercial manufacture of paper, the mix for which had been sized previously by ordinary types of rosin sizing precipitated by alum; (2) as an alternate or supplement to the process just referred to, the use of paraffin in emulsified form, in lieu of rosin as a sizing agent in the paper made with a carbonate filler; (3) a modification of the process referred to in (2), supra, wherein a "breakable" paraffin emulsion can be used with rosin as the emulsifying agent therefor, plus a changed order of addition of materials to manufacture carbonate filled paper; and (4) the use of starch to prevent excessive foaming in connection with certain paper stocks to manufacture paper with a carbonate filler.

It will be observed in each instance the processes or methods described by the patents purport to deal with problems which arise by the use of a carbonate filler for the manufacture of paper.

As to the Minimizing Patent, No. 1,803,642.

This patent is referred to by the parties as the "minimizing" patent, and for convenience we will so refer to it. Rafton states: "The principal object of this invention is to provide a sized paper made with a carbonate filler in such manner that deterioration by the carbonate filler of the sizing agent or agents employed is substantially avoided." The deterioration here referred to results from the fact that rosin sizing, precipitated by alum, is acid and the carbonate filler, usually calcium carbonate, is alkali. Therefore, the two act upon each other to their mutual disintegration and with damage to the paper. Rafton's process consists of "minimizing" the time of contact between acid and alkali; or introducing the alkali, the carbonate filler, into the paper making system in such wise that it comes into less intimate contact with the acid paper mix, because introduced while the latter is in dilute form. In the patent specification Rafton states that his preferred procedure consists of a method whereby both time of contact between the antagonistic materials and the intimacy of their contact is minimized. He states: " * * * the preferred procedure is to add the carbonate filler at or subsequent to the point where the mix is diluted for delivery to the web-forming end of the paper machine. From this point to the point of web formation the time of contact is extremely short and the intimacy of contact is practically at a minimum owing to the high dilution."

Only two claims of the "minimizing" patent are alleged to be infringed by the appellee's process, viz., 1 and 8.[1]

1. The method of manufacturing a sized paper filled with carbonate filler comprising adding carbonate filler, in an amount sufficient to impart a substantial

It will be obvious that claim 1 of the patent refers to the "minimizing" of "time of contact between the carbonate filler and the previously sized fiber," and that claim 8 provides a method for filling a sized paper with carbonate filler "when such fiber is in condition to be passed onto a web-forming device of a paper machine."

In order to make plain the respective contentions of the parties, both in regard to the "minimizing" patent and the other patents in suit in the case at bar, a brief description of the usual method or system employed in manufacturing paper is necessary. Accordingly, we state that wood pulp, with filler, sizing, and other materials, is placed in a beater or Hollander wherein these materials with water are beaten by knives and bars into a homogeneous mass. From the beater the stock is drawn off into a beater chest, really a storage tank, and thence it is pumped continuously to a jordan, where the fiber of the stock is further reduced; thence it goes into another storage tank, which is called the machine chest. From the machine chest the paper stock is passed into a mixing box. In the mixing box the stock receives further large dilution by water. From the mixing box the stock moves through rifflers to screens, which remove over-sized particles and impurities, and thence flows to the head box. Thence the mix is passed onto an endless belt of fine mesh wire, called the machine or making wire, which moves upon rollers in the direction of the flow of the mix. As the water flows off and the making wire rolls on, there is left upon the making wire the substance of the mix, a web or material, which, when dried and pressed by driers and calenders, is in fact paper.

The appellee's process is described by the learned trial judge in his fourteenth finding of fact as follows: "In the defendant's process, ordinary straight calcium carbonate is used and added to the sized paper stock at the inlet to the machine chest. The paper stock in the machine chest to which the carbonate filler is added is in thick or concentrated form. The stock containing car-

bonate filler remains in the machine chest for at least two hours."

It is obvious from this finding, if it be supported by sufficient evidence, that the eighth claim of the patent is not infringed, since at the point where the appellee adds the carbonate filler, the fiber or stock is not in a condition to be passed onto the web-forming device of the paper machine. The stock does not reach such condition until it comes into the mixing box and receives therein substantial dilution by water. An examination of the testimony convinces us that this finding of the court below is fully supported by the evidence, and we therefore concur in the ruling of the court below that the eighth claim of the "minimizing" patent is not infringed.

Is the first claim of the patent infringed by the appellee's procedure? It is obvious that, by adding the carbonate filler at the machine chest, the appellee has put it into the paper making system at a later place, therefore later in point of time than if the carbonate had been added at the jordan, the beater chest, or the beater. Can this be an infringement of the minimizing process of the appellant as referred to in claim 1? In the claim, time of contact between the antagonistic materials is solely referred to. The claim refers to "previously sized fiber." No other condition is imposed. The word minimize means "to reduce to the smallest part or proportion possible", "to reduce to the smallest possible amount or degree."[2] To minimize time of contact means to reduce the time of contact to the smallest possible proportion. As stated in the fourteenth finding of fact, in the appellee's procedure the stock containing carbonate filler remains in the machine chest for at least two hours. It is obvious that this procedure does not favor the reduction of the time of contact between the carbonate filler and the previously sized fiber to the smallest possible degree. In so holding, we concur in the ruling of the trial court, which is substantially to the same effect.

We are not unmindful of the decisions

degree of filling to the resulting paper, to previously sized fibre in the paper-making process under conditions favoring the minimizing of time of contact between the carbonate filler and the previously sized fibre, and thereafter making paper therefrom.

8. The step in a method of manufacturing a sized paper filled with carbonate

filler comprising adding a carbonate filler, in an amount sufficient to impart a substantial degree of filling to the resulting paper, to previously sized fibre when such fibre is in condition to be passed onto to a web-forming device of a paper machine.

[2] Webster's International Dictionary; Funk & Wagnalls Standard Dictionary.

of this court in Ryder v. Schlichter, 3 Cir., 126 F. 487, 491, and Boyer v. Keller Tool Company, 3 Cir., 127 F. 130. In the case at bar, however, to put upon the first claim of the patent the interpretation contended for by the appellant is to confer upon the word "minimize" a meaning unknown to our language.

We deem it unnecessary to discuss whether or not the patent is invalid over the prior art and whether or not the paper manufactured by the appellee is sized within the meaning of the patent.

### As to the Paraffin Patents, No. 1,819,441 and No. 1,848,659.

We will endeavor to discuss these two patents and their respective disclosures under the same heading.

The first paraffin patent, No. 1,819,441, was issued upon August 18, 1931, upon an application filed March 15, 1928. The second paraffin patent, No. 1,848,659, was issued upon March 8, 1932, upon an application filed April 8, 1929.

As we have stated in discussing the minimizing patent, a rosin sizing precipitated by alum is acid, and carbonate filler is alkali. Being thus antagonistic, each works to the disintegration of the other. The first paraffin patent lays emphasis upon the avoidance of the use of rosin and substitutes therefor paraffin emulsion as the sizing agent to be used in the manufacture of paper. The preferred order of addition of materials disclosed by the patent is to put the paraffin with the carbonate into the beater with the fibrous pulp and then add alum, or alum and starch. The heart of Rafton's disclosure is set forth in the patent in the following language: "I have discovered that a paraffin emulsion and an aqueous suspension of carbonate filler mutually flocculate one another and that this 'flocculate' or 'complex' of paraffin and carbonate filler does not partake of the nature of discrete particles of paraffin, * * * and has no tendency to ball up and agglomerate as do unattached discrete particles of paraffin released from the emulsified condition. * * *" As the word "flocculate" is here used, we think it indicates a coalescence or adherence between the particles of paraffin and the carbonate filler. As an example of the method of practicing this invention, Rafton states in the patent: "I may place the fibrous pulp in the beater, * * * then add the paraffin emulsion, * * * incorporate this thoroughly with the pulp, then add the carbonate filler, then starch if desired and/or alum * * *."

In our opinion, it is obvious that the flocculation referred to and the creation of the flocculate or complex between the paraffin emulsion and the carbonate filler must take place prior to the addition of alum, since the addition of alum necessarily would serve immediately to precipitate upon the paper stock the paraffin emulsion and the carbonate. Therefore, whatever might be the order of addition of materials in the process prior to the addition of alum, it is obvious that alum must be last added to the mix and added after the flocculation has taken place. In the appellee's procedure, however, and we describe it in the terms expressed upon the appellant's brief, the paraffin is put with the paper stock in the beater with rosin and alum and the carbonate is not added until the mix arrives at the machine chest. It is apparent therefore that in the appellee's procedure the paraffin emulsion has been thrown down upon the paper stock prior to its coming to the machine chest. In view of the foregoing, it is entirely clear that there is no infringement of the first paraffin patent by the procedure of the appellee. Furthermore, as we have stated, the patent lays emphasis upon the avoidance of rosin. The appellee uses substantial quantities of rosin in its procedure. For example, Baker, the manager of the Paper Research of the appellee, testified that the proportion of paraffin to rosin used by the appellee in furnishes MX27 and MX37 was in the ratio of 16 per cent. to 84 per cent. of rosin.

In view of the foregoing, we concur in the ruling of the learned District Judge as expressed by him in his opinion, as follows: "Our conclusion is that the defendant's procedure does not infringe this patent, because it uses a rosin size with a small proportion of paraffin, which size is precipitated by alum in the paper stock in the beater. The carbonate filler is not added until the paper stock with the already precipitated size arrives at the machine chest."

In the second paraffin patent, alleged to be a modification of and an improvement upon the first, Rafton claims the use of a "saponaceous paraffin emulsion which may be precipitated in the beater by * * * alum." Rosin is prescribed as the emulsifying agent for the paraffin. Rafton states in the patent: "I have also discovered a modification of that process (the procedure

of the first paraffin patent) wherein a breakable paraffin emulsion, such for instance as a saponaceous paraffin emulsion * * * is thrown down—i. e. broken—by the action of * * * alum instead of by carbonate filler." Briefly stated, therefore, in the second paraffin patent Rafton sets out a method whereby the paraffin emulsion first is precipitated by alum.

The patent then states: "I have found that the precipitate produced by * * * alum with a breakable paraffin emulsion * * * may be used in sizing paper filled with carbonate filler as the precipitate is affected only very slowly by the action of carbonate filler, in fact so slowly that in the lengths of time ordinarily employed, it is not ordinarily affected thereby sufficiently to interfere with its practical use."[3] The preferred practice of the patent is stated to be as follows: "I add to the fibrous material in the beater * * * a suitable amount of breakable paraffin emulsion, * * * allow a sufficient time for mixing, and then add a quantity of alum, at least sufficient to completely throw down the said emulsion, * * * I then add carbonate filler."

We deem it to be abundantly clear that the second paraffin patent directs itself to the manufacture of a carbonate filled paper, sized with a paraffin emulsion precipitated by alum before the addition of the carbonate. The appellee contends that this procedure is precisely that referred to as part of the prior art in the first paraffin patent, but we can find no words in the first patent which bear out such a construction.

The appellee contends that the use of wax-like emulsions precipitated by metallic salts is ancient in the art, and that waxes precipitated by alum have been used for the manufacture of book paper filled with carbonate for a very considerable length of time. It cites Dreher's British patent No. 12,668 of 1900, and DeCew's British patent No. 13,588 of 1915, as showing processes for the emulsifying of paraffin by rosin and thereafter saponifying it. These contentions are supported fully by the evidence.

The Miles' United States patent No. 1,228,580, issued June 5, 1917, refers to the use of filling materials such as "china clay, blanc-fixe, satin white, or any of the finely comminuted mineral fillers which are habitually incorporated in the paper. * * *" Carbonates, such as calcium carbonate, must be deemed to be within the definition of the Miles' patent of finely comminuted mineral fillers. Satin white was held by the court below to be chemically the full equivalent of calcium carbonate.

We cannot hold that the time or point in the paper making system when or where alum is added to be a matter of importance. The prior art discloses its addition both early and late in the manufacture of paper. The use of calcium carbonate as filler is old in the art of manufacturing paper. The use of paraffin, the process of its emulsification by rosin or other substances, for use as sizing of paper, is also old.

As stated by the trial judge in his twenty-eighth finding of fact: "The substitution of calcium carbonate for other fillers in a process in which paraffin emulsion is used is the substitution of an equivalent and was within the skill of the paper manufacturer." With this finding we are in accord, and the evidence supports it beyond any reasonable doubt. The rulings of this court in Yablick v. Protecto, etc., Corporation, 3 Cir., 21 F.2d 885, 887, and in Allen Filter Co. v. Star, etc., Co., 3 Cir., 40 F.2d 252, are not applicable to the facts of the case at bar. In addition, those facts fully support the sixteenth and seventeenth findings of fact of the trial court.[4] In our opinion the monopoly should not be sustained when there has been a mere substitution of material except under circumstances of great rarity. Hotchkiss v. Green-

---

[3] This language of the second paraffin patent denies a major principle of the first, in that it sets forth the identical method stated by the first paraffin patent as being used in the prior art, but which creates lumps and flakes of paraffin.

[4] "16. It was well known in the art that a greater degree of sizing could be obtained with paraffin emulsions than with the commonly employed rosin sizes, and prior to 1925, paraffin emulsions had been used in the production of highly sized papers.

"17. Prior to 1926 paraffin emulsions were only available in relatively dilute form, which rendered their cost of shipment expensive. In 1925 methods were developed which permitted the preparation of paraffin emulsion in a more concentrated form. In 1926 such emulsions became commercially available, and from that time have found substantial and increasing application in the paper industry."

wood, 11 How. 248, 13 L.Ed. 683; Brown v. District of Columbia, 130 U.S. 87, 9 S.Ct. 437, 32 L.Ed. 863; American Acetylene Burner Co. v. Kirchberger, 2 Cir., 142 F. 745, affirmed 2 Cir., 147 F. 253. As was stated by Judge Cox in Union Hardware Co. v. Selchow, 2 Cir., 112 F. 1006, 1008: "Where the inventor has discovered new and unknown properties residing in a given material or that a long sought for result, which has baffled an army of skilled artisans, can be achieved by the change, in such cases the substitution of one material for another may reach the plane of invention. But substitution alone, unaccompanied by any actual advance in the art or genuine benefit to the public, has uniformly been held insufficient to support a patent." The rule enunciated by Judge Cox in the cited case was referred to with approval by Judge Woolley in Low v. McMaster, 3 Cir., 266 F. 518, 520. In our opinion, there is nothing in the record in the case at bar which indicates that the procedure outlined in the second paraffin patent should be deemed to be within the announced exceptions to the rule of substituted equivalents.

For the reasons given, we deem the second paraffin patent to be invalid.

### As to the Starch Patent, No. 1,831,928.

In this patent Rafton states: "I am well aware that starch has been used in paper making for a great many years, notably as a sizing agent or assistant, for hardening paper, for increasing retention or the like, but it will be noted that my use of starch is wholly different, as I use starch for none of these purposes but rather as a foam affecting agent." He states that a simple method of practicing his invention " * * * is to introduce the fibrous materials, the filler of the type referred to, together with the starch or starch and alum into the beater, * * * This furnish is then given the usual treatment, and run off on the paper machine in the regular manner. My invention, however, is not confined to this particular method, as it also includes the addition of starch or starch and alum to one or more of the other ingredients of the furnish at any other convenient point either before or during the paper manufacturing process, and moreover it comprehends any order of the mixing of the starch or the starch and alum and one or more of the other ingredients, although of course, where starch and alum are both used, they need not necessarily be added at the same time or point. Moreover, it embraces the addition of starch or starch and alum to one or more of the other ingredients by steps or stages if desired, instead of by the addition of the entire amount of the starch or the starch and the alum at one time, and of course, here, as above, where starch and alum are both used, they need not necessarily be added at the same time or point." Rafton urges that he has found a new use for starch, the use of employing it to kill foam, which in his opinion excessively is engendered by the use of carbonate fillers.

Without detailing the prior art, there can be no doubt that starch has been used as a sizing agent or adjuvant almost from the dawn of paper making. The prior art discloses, as stated in the thirty-sixth finding of fact, that the amount of starch so used ranged between 1 per cent. and 6 per cent. of the weight of the paper. The amount of starch to be used, as disclosed in Rafton's starch patent, ranges between 1.9 per cent. and 4.2 per cent. We therefore must conclude that, so far as the application of any principle of quantity is concerned, Rafton indicates no change over the prior art. Furthermore, we can find no element of invention in the patent in so far as the point of addition of the starch to the paper stock is concerned. Rafton states simply that the starch may be put into the beater or " * * * at any other convenient point either before or during the paper manufacturing process. * * " It is abundantly clear from the record that wherever it be added within the whole range of the paper making system, from the beater to the making or machine wire, its effect is always the same.

What Rafton claims is in fact a patent on a new purpose involving the discovery of a reason for an effect which, if it be as claimed, must have been observable by the prior art. As was correctly held by the learned District Judge, this is not patentable. General Electric Company v. Cooper Hewitt Electric Company, 6 Cir., 249 F. 69; National Meter Company v. Neptune Meter Company, C.C., 122 F. 82, affirmed 3 Cir., 129 F. 124; Kissock v. Duquesne Company, 3 Cir., 37 F.2d 249; Dorlan v. Guie, C.C., 25 F. 816; In re Kemper, 14 Fed.Cas. p. 286, No. 7,687. No additional authorities need be cited.

In our opinion, this patent is invalid for the reasons stated. Moreover, as stat-

ed by the court below, there is nothing to indicate from the evidence that the appellee's process of manufacture of paper created, or tends to create, any foam problem incapable of being disposed of by the ordinary foam equipment with which paper making systems are furnished. The thirty-seventh finding of fact of the trial court is amply supported by the evidence.[5] In our opinion, even if valid, the patent is not infringed.

Accordingly, the decree of the court below will be affirmed.

[5] "37. Defendant used starch and alum at a time when it was using only clay filler in its paper. The starch was used to strengthen its sheet and to make it possible to use more filler; the alum was used to precipitate the size. When the defendant substituted some carbonate filler for part of the clay filler, the use of starch and alum was continued in the same manner as theretofore, the same filler starch ratio being used."